# EXHIBIT 3

## AFFIDAVIT OF JOSEPH W. WATKINS

STATE OF ARIONA     )
                        ) ss.
County of Pima      )

I, Joseph W. Watkins, under penalty of perjury and upon my oath, hereby attest to the following:

1.     I have personal knowledge of all matters alleged herein.

2.     I am an attorney licensed and authorized to practice law in Arizona, including District Court, since 1988.

3.     My CV is attached hereto at Exhibit A. My background and experience as reflected in my CV qualify me to render professional opinions on insurance claims handling including the appraisal process.

4.     Attached hereto at Exhibit B is a Report I prepared on behalf of attorney Robert Ryan addressing claims handling and appraisal issues in the case of Le v. State Farm, CV 22-00044-TUC-SHR (LAB).

5.     I relied upon a number of pleadings, party disclosures, documents, publications and case law as reflected in my Report in arriving at my conclusions. These pleadings, party disclosures, documents, publications, and case law contain the kind of facts and data that experts in the field of insurance claims handling reasonably rely upon in forming opinions to assist the judge or jury on claims handling issues including issues pertaining to appraisal.

1

6.      My Report contains my opinions on this matter to date. I understand that

additional depositions either have or are being taken and discovery is ongoing. Therefore,

I reserve the right to update my Report as warranted by new information obtained

through discovery.

_____
Joseph W. Watkins

Acknowledged before me this _____ day of April 2023.

_____
Notary Public

My Commission Expires:

ROSEMARY GUADIANA
NOTARY PUBLIC - ARIZONA
PIMA COUNTY
COMMISSION # 591700
MY COMMISSION EXPIRES
SEPTEMBER 27, 2024

# EXHIBIT A

**Joseph W. Watkins**
Insurance Consultant - Attorney at Law

| | |
|---|---|
| 1661 N. Swan, Ste. 250 | 208A E. Washington St. |
| Tucson, Arizona 85712 | Lexington, VA |
| Telephone (520) 882-9115 | (540) 784-3070 |

## Curriculum Vitae

**BACKGROUND AND QUALIFICATIONS:**

I have worked as an attorney specializing in insurance claims, personal injury and litigation related issues since 1988. I am currently licensed to practice in Arizona and Virginia. Prior to becoming an attorney, I worked in commercial television in both news and documentary production. As part of my undergraduate college training, I successfully completed an internship in television production with State Farm Insurance at State Farm's corporate headquarters in Bloomington, Illinois. That job entailed writing, producing and editing educational programming utilized by State Farm in the training of its employees.

After graduating with a Communications/Radio, TV, Film degree (BA) from Illinois State University in 1981, I worked in television news and documentary production with ABC's Charleston, South Carolina affiliate and then the Illinois Information Service, a publicly funded production facility, until 1985. My work included writing, producing and directing both news pieces and documentary productions.

In 1985, I began my law studies at the University of Arizona College of Law. While at the University of Arizona, I clerked for Professor Dan Dobbs, a leading author and expert in tort law. During law school, I also worked for a number of local attorneys and firms including the Pima County Attorney's Office and Bury, Moeller, Humphrey & O'Meara, a Tucson based insurance defense firm. While at Arizona, I participated in various Moot Court and trial practice competitions, ultimately winning the Jenk's Trial Practice Competition in 1988.

Following graduation, I was hired by Gust, Rosenfeld & Henderson, one of the oldest and most distinguished law firms in Arizona, as an associate in litigation. While at Gust, I developed a free-standing insurance defense practice ultimately bringing in a diverse group of clients including State Farm, Allstate Insurance, Northbrook Insurance, Farmers Insurance and Vanliner Insurance, to name a few. I also did an extensive amount of work with various trucking entities including United Van Lines, Mayflower Van Lines and other smaller, regional carriers.

I routinely worked with adjusters and claims managers on both defense and education issues. This included meeting and working with adjusters and conducting lunch time "brown bag"

1

seminars on insurance related issues with an eye towards increasing claims accuracy and eliminating bad faith.

In 1992, I opened my own practice, Joseph W. Watkins P.C., continuing my insurance defense and interstate trucking related work. Between 1992 and 2003 my practice was focused primarily on insurance defense including coverage work and related litigation. I pioneered an "Agreed Fee" (flat fee) program with State Farm which was the first of its kind in Arizona.

Around 2003, with insurance carriers increasingly moving to captive or in-house counsel, I began taking on more plaintiffs cases. My practice increasingly began to focus on bad faith litigation including the Mt. Lemon fire loss claims which included representing over 116 clients with claims involving over a dozen different insurance carriers. In addition to fire loss claims, I also handle an extensive amount of storm related litigation all of which continues to this day.

I began doing expert work on a limited basis in 2007. It occurred to me that any individual providing insurance expert testimony should, at least, be familiar with the background and training required to actually adjust losses. I had overseen hundreds of cases as lead counsel, for both the defense and plaintiffs, even so, I felt I needed additional experience in, for lack of better words, the "nuts and bolts" of insurance claims. In 2010, I trained for and successfully completed the licensing requirements for adjusting insurance claims and became licensed as an adjuster by the State of Arizona.

I have routinely, over the years, assisted and advised various Homeowners Association's, businesses, attorneys and trade groups on insurance issues ranging from coverage to claims issues.

With 35 years of experience in law, the vast majority of which has been devoted to insurance related claims and issues, I see my duty as a consultant to objectively and accurately review and identify claims handling issues in order assist the court and/or jury in understanding those issues. My ultimate goal is to improve the claims handling process and promote fair claims handling practices.

## EDUCATION

1988    **University of Arizona, College of Law** (Tucson, AZ)
*Juris Doctorate*
- Jenks Trial Competition Champion (1988)
- Research Assistant, Professor Dan Dobbs (1987 – 1988)

1981    **Illinois State University** (Normal, IL)
*Bachelor of Fine Arts*
- TV 10 Public Broadcasting, Producer/Director (1981)
- State Farm Insurance Co., Audio Visual Internship (1980)

- National Student Exchange Program, College of Journalism, University of Georgia Athens (1979 – 1980)

**LEGAL WORK EXPERIENCE**

2009 – Present      **Joseph W. Watkins, P.C.**
  *Insurance Consultant*

1992 – Present      **Joseph W. Watkins, P.C.**
  *Sole Practitioner*
  - Insurance Bad Faith
  - Personal Injury
  - Interstate Trucking & Insurance
  - Homeowners Association & Risk Management

1988 – 1992      **Gust, Rosenfeld & Henderson**
*Associate Attorney, Litigation Department*
  - Insurance Defense.
  - Commercial Institution & Banking Defense

## PRESENTATIONS
2010  Insurance Bad Faith Primer, Western Trial Lawyers' Association Summer Conference
2011  Risk Management Presentation, Independent Adjusters & Brokers Assoc. of Arizona March 8, 2011.

## ADDITIONAL TRAINING & EDUCATION
2010  Licensed Property & Casual Insurance Adjuster, Arizona Department of Insurance Licensure Program.

  Property & Casualty Adjuster Training.

1991  Arizona College of Trial Advocacy Program.

## PROFESSIONAL AFFILIATIONS
- Arizona State Bar (1988 – Present)
- Virginia State Bar (2015 – Present)
- American Association of Justice, AAJ, *formerly known as American Trial Lawyers Association, ATLA* (2004 -  Present)
  Insurance Litigation & Admiralty Law Sections
- Western Trial Lawyers Association, WTLA (2009 – 2016)
- Conference of Freight Counsel (1990 – 2002)

- Maricopa County Bar Association (1988 – 2000)
- Pima County Bar Association (2000 – 2006)
- Pima County Defense Bar (1992 – 2000)

**COMMUNITY SERVICE**
- Desert Labrador-Retriever Rescue, *Contributing Volunteer* (2009 – 2016)
- St. Alban's Pre-School Fundraising Committee, *Member* (2009 – 2011)
- AYSO Soccer, *Coach* (2009, 1999 – 2001)
- Jewish Community Center Pre-School Fundraising & Teacher Appreciation Committees, *Member* (2007 – 2009)
- Men's Anti-Violence Partnership (MAP) Council, *Founding Member* (2007 – 2009)
- Arizona State Bar Volunteer Teachers Program, *Instructor*  (2000 – 2004)
- YMCA Baseball Tucson, *Coach* (2000 – 2001)
- Tucson Zoo Annual Party Fundraising Committee, *Member* (1997 – 2000)
- Supporter/Sponsor  Southern Arizona Women's Foundation (2012-Present)
- Yellow Brick Road Early Childhood Learning Center, Lexington, VA. Board Member/pro-bono counsel. (2019-Present)
- Rockbridge Area Transportation Service, Lexington, VA. Pro-bono counsel.

**Consulting Case List**

*Loma Real Property Investments*, *LLC v. Scottsdale Indemnity Company*, Maricopa Cause No. CV-2012-011321, Multiple hail loss claims. Claims one through appraisal or towards injured as opposed to what was initially offered by carriers. Prepared report. Rollie Wightman.

*Anteseliovich v. IDS Property Casualty Company*, et al, Maricopa Cause No. CV-2013-005659, water Loss claim. Prepared report. Steve Silverman.

*Harris v. State Farm*, Apache County Case No.: CV2014-194, multiple smoke damage claims. Prepared report. Rollie Wightman.

*Loma Real Property Investments, LLC v. Scottsdale Indemnity Company*, Maricopa Cause No. CV-2012-011321, Multiple Hail Damage Claims. Prepared report. Rollie Wightman

*Gordon v. Allstate*, Maricopa County Case No. CV2009-024567, 2008 Mesa water loss claim. Prepared report. Tom Dixon.

*Grier v. American Family*, Maricopa County Case No. CV2011-015524, water loss claim. Prepared report. Tom Dixon.

*RLS Capital v. State Farm*, Maricopa County Case No. CV2011-01226, fire loss claim. Prepared report. Tom Dixon.

*Sandahl v. Foremost Insurance*, weight of snow/collapse case. Prepared report. Rob Ryan.

*Todd v. Valley Forge Insurance Company*, Maricopa County Case No.   2009-039174CV, UIM bad faith. Colby Kanouse.

*Ulibarri v. State Farm*, Maricopa County Case No.   CV2010 – 029925, Steam boiler case. Opinions disclosed. Tom Dixon.
Ruiz v. American Family, Federal District Court – Tucson, 4:20 CV00500-DCB (2020)

*Winderlich v. American Family*, Maricopa County Case No.  No. CV2010-052847, hail loss appraisal case. Multiple claims. Tom Dixon.

*Crabtree v. American National Property and Casualty Company*, Maricopa County case number CV 2017-009213. Egregious bad faith claim involving backdating loss date by claims adjuster and supervisor. Settled just before trial. Tom Dixon

# EXHIBIT B

Law Office of
**JOSEPH W. WATKINS, P.C.**
E-mail: joewlaw2@gmail.com
www.joewatkinslaw.com
Fax (520) 882-7708

1661 N. Swan, Ste. 138                              208 A, E. Washington St.
Tucson, Arizona 85712                              Lexington, VA 24450
Telephone (520) 882-9115                           Telephone (540) 205-8191

April 3, 2023

Robert D. Ryan
Attorney at Law
343 W. Roosevelt Street, Suite 220
Phoenix, AZ 85003

     Re:    Le v. State Farm
          Maricopa County Case No. C20216021
          Federal District Court (Removed by SF) CV 22-00044-TUC-SHR (LAB)

Dear Mr. Ryan,

At your request, I have reviewed the documents listed herein and, as per Federal Rules of Civil Procedure 26(a)(2)B, I offer the enclosed comments and/or opinions with regard to the subject litigation identified above.

As per Rule 26 disclosure requirements, I have disclosed in my accompanying Affidavit my CV including all cases where I have been asked to render an opinion on subject matter involving claims handling issues.

As per Rule 26 disclosure requirements, my fees for services are outlined in my contractual agreement between myself and the retaining client and for this case are as follows;

- $5000                          Initial Retainer.
- $500 per hour                  Document Review Time and Testimony (4-hour deposition minimum).
- $0.60 per mile                 Travel Mileage.
- Additional Costs               Reimbursement for Air Travel, Meals & Hotels.

After reviewing all documents, exhibits and additional information made available to me and listed in my Report, I offer the following assessment of facts and opinions. My opinions are based on my 34+ years of experience as an attorney licensed in Arizona including the United States District Court of Arizona. That experience includes 15 years of insurance defense/coverage work for various

-2-

carriers and 20+ years representing individuals and businesses in insurance related claims, consultation, and litigation.

## Materials Reviewed

- Party pleadings, Disclosures and attachments thereto, Magistrate Order and Recommendations, Order Confirming the Appraisal Award. Le v. State Farm, Maricopa County Case No. C20216021.
- 1943 New York Standard Fire Policy.
- State Farm Rental Dwelling Policy disclosed in Le.
- State Farm Claims File (Redacted) disclosed in Le.
- The initial Appraisal Award and corrected Appraisal Award issued in Le.
- State Farm's Motion to Confirm Appraisal Award in *Jasem v. State Farm Fire and Casualty Company*, CV 06-595-PHX-DGC.
- ARS 20-461, which is also commonly known as the Unfair Claims Settlement Practices Act.
- File materials including emails and other communications between State Farm and its insureds pertaining to Larson, Garroll White and Jessica Titius, Hanns, Mateus, Mitchell/Anctil, Sherry and Mike Nelson, Flesher, and Heartland, discussed in more detail below.
- State Farm Appraisal Operations Guide 75-09.
- Deposition Transcript of Mary Houtchens.
- Deposition transcript of Abel Costales.
- Order Confirming the Appraisal Award in Michael Seip, et al. v. Western Agricultural Insurance Company, et al.
- Richey v. Attorney General of Arizona, Slip Copy (2021). (Objections are to the R&R are not to "be construed as a second opportunity to present the arguments already considered by the Magistrate Judge." Citing Betancourt v. Ace Ins. Co. of Puerto Rico, 313 F. Supp.2d 32, 34 (D.P.R. 2004).)

## Additional Resource Materials

There are any number of resource materials pertaining to claims handling and, specifically, insurance appraisal, that experts in the insurance field would reasonably rely on in forming an opinion on both claims handling in the appraisal process. In addition to existing case law, review of current on-going litigation, and Arizona's Unfair Claims Practices statute, I have relied upon several different resources including:

- The Law and Procedure of Insurance Appraisal, Jonathan J. Wilkofsky, Ditmas Park Legal Publishing, LTD., 2003.

- APPRAISAL AND THE PROPERTY INSURANCE APPRAISAL CLAUSE--A CRITICAL ANALYSIS: GUIDANCE AND RECOMMENDATIONS FOR ARIZONA, Amy M. Coughenour, 41 Ariz. St. L.J. 403, 2009.

-3-

- Property Loss Adjusting, Volume 1, Second Edition, James J Markham, Insurance Institute of America, 1995.

- How to Estimate Building Losses and Construction Costs, Fourth Edition, Paul I. Thomas, 1983.
  (Slate & tile/cement required one-half a roll of 30-pound asphalt-saturated felt per square. P. 294).

- Ariz. Admin. Code § 4-9-108.
  A.  A contractor shall perform all work in a professional and workmanlike manner.
  B.  A contractor shall perform all work in accordance with any applicable building codes and professional industry standards. For work to be performed in accordance with professional industry standards, a contractor shall use such skills, prudence, and diligence in performing and completing tasks undertaken that the completed work meets the standards of a similarly licensed contractor possessing ordinary skill and capacity.
  C.  All work performed by a contractor in a county, city, or town that has not adopted building codes or where any adopted building codes do not contain specific provisions applicable to that aspect of construction work shall be performed in accordance with professional industry standards.

- Workmanship Standards for Licensed Contractors, Arizona Registrar of Contractors, 2009.

### Generalized Narrative of the Underlying Facts and Issues

On or about May 2, 2020, fire damaged a rental property owned by the Les on E. Beverly St. in Tucson, Arizona (the "Property"). At the time the fire occurred, the property was insured by State Farm Fire and Casualty Company ("State Farm") through a Rental Dwelling Policy. For approximately four (4) years before the fire, Les had rented the property to Homestyle Galleries in Tucson with the rent at the time of the fire being $1200 per month. Unbeknownst to the Les, as Homestyle Galleries was timely with its rent, the property had been sublet prior to the fire. The Les reported the fire to their insurer, State Farm, which accepted coverage and initially paid approximately $63,300 based on what State Farm determined to be the actual cash value ("ACV") of the claim. Despite having been provided with proof of rental income generated by the Property multiple times throughout the handling of the claim, State Farm has never paid anything to the Les for loss of rent. The Les disputed the State Farm estimate suspecting the damages were significantly worse. Accordingly, the Les retained Associated Adjustment Bureau, Inc. ("Associated") to act as public adjusters on the file including independently estimating the amount of damage caused by the fire loss.

Associated prepared an estimate which determined damages of $182,608.42 as replacement cost ("RCV") and $171,092.33 depreciated costs (ACV) for the fire loss. The Les also made a claim for lost rents based upon the rental history of the property. The Parties were unable to reach an agreement as to the amount of damage caused by the fire and State Farm continued its refusal to

-4-

pay any amount for lost rents. On December 28, 2020, the Les demanded appraisal pursuant to the specific terms of their policy. They retained Sam Fernandez an appraiser with State Farm retaining the services of appraiser Adam Salene. Amy Lieberman was agreed upon by both parties to serve as a neutral or Umpire on the appraisal panel. On or about September 21, 2021, the appraisal panel issued an Award assessing the RCV damages at $193,509.49 and an ACV value of $177,398.90. On or about December 24, 2021, the appraisal panel confirmed its valuation of The Le Fire Claim included "only those damages that we [the appraisal panel] determined were caused by the fire loss at issue . . .." **State Farm Appraiser Adam Salene refused to sign the award**. The appraisal award was greater than $100,000 more than what State Farm had been willing to pay. It was also nearly identical with the estimating that had been presented by the Les' public adjusters more than a year earlier.

After the appraisal award was issued, State Farm neither paid nor communicated with the insureds regarding the award for the next several weeks. On October 21, 2021, State Farm substituted its judgment for that of the appraisal panel issuing a revised estimate which wholly neglected the appraisal award in a manner contrary to both the Insurance Policy and Arizona law, unilaterally reducing the damages by more than $80,000. State Farm estimated the Le fire claim as having a replacement cost value of $118,535.28, and an actual cash value of $93,302.05. 28. State Farm ultimately issued the Les a supplemental payout on October 21, 2021, in the amount of only $27,767.99. Nothing was ever paid for lost rents.

On or about December 27, 2021, the Les, through counsel, filed a Complaint in Pima County Superior Court against State Farm alleging both Breach of Contract and Insurance Bad Faith also known As Breach of the Duty of Good Faith and Fair Dealing. On or about January 26, 2022, State Farm removed the action to the United States District Court in Tucson. On February 23, 2022, the Les filed a Motion to confirm the appraisal award. After substantial breathing by both parties, on September 8, 2022, Magistrate Judge Bowman issued a Report and Recommendation finding in favor of the Les and recommending that the District Court in an Order confirming the appraisal panel's findings and denying State Farm's motion to vacate the award. On December 27, 2022, United States District Court Judge, Scott Rash issued an Order adopting Magistrate Bowman's Report and Recommendations, confirming the appraisal award and denying State Farm's objections thereto.

Though the appraisal award was confirmed, the remainder of the litigation moves forward on the breach of contract and bad faith issues.

## Claims Handling Principles

An insurer owes the insured a duty of good faith and fair dealing separate from the duties under the insurance contract and those arising from statute, regulation, or case law. The insurer's duty of good faith and fair dealing is affirmative and unconditional. Internal claim guidelines usually acknowledge this and give guidance on how to deliver the required level of service. In order to adjust

-5-

a claim in good faith, an insurance carrier must give the insured equal consideration throughout the claims process and must not put its own interests unfairly or unreasonably ahead of those of the insured.

In one form or another, most states have enacted statutes, regulations, or supervision that govern claim-handling practices. These claims practices standards impose certain duties and obligations on an insurer in the handling of a first-party claim. While statutes, regulations, or other standards set outlines for good claim handling, they do not completely define the parameters required for every specific situation; that requires internal standards of fairness by the insurer.

Industry standards require claim handlers to know and comply with applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law. The National Association of Insurance Commissioners created a Model Unfair Claims Practices Act (the "Act"), that provides statutory and regulatory standards for the handling of insurance claims. Over 45 states have adopted the Model Unfair Claims Practices Act, either in part or in its original form. The industry recognizes the importance of the Model Act and address it in the AIC-33 (Associate in Claims) textbook, "The Claims Environment" (Markham, First Edition, 1993, p. 249) when it states, "insureds are frequently permitted to introduce evidence of violations of the Model Unfair Claims Settlement Practices Act and Model Unfair Claims Settlement Practices Regulations because the model act is a recommended standard of care. It was developed by the National Association of Insurance Commissioners as a guide for insurance regulators in every state to establish reasonable claim practices."

Arizona has promulgated these claims standards for insurance companies to follow under ARS 20-461, which is also commonly known as the Unfair Claims Settlement Practices Act. These items include, but are not limited to:

(1) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under an insurance policy;

(4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(5) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(7) As a property or casualty insurer, failing to recognize a valid assignment of a claim. The property or casualty insurer shall have the rights consistent with the provisions of its insurance policy to receive notice of loss or claim and to all defenses it may have to the loss or claim, but not otherwise to restrict an assignment of a loss or claim after a loss has occurred;

-6-

(8) Compelling insureds to initiate or submit to litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

(9) Attempting to settle a claim for less than the amount to which a reasonable person would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

(10) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

(11) Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which the payments are being made;

(12) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(13) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(14) Failing to promptly settle claims if liability has become reasonably clear under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(15) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

These regulations impose certain duties and obligations on an insurer in the handling of claims consistent with the claims handling standards cited above. Insurance industry standards require claim handlers to know and comply with applicable law and regulations that impact claim handling and treat policyholders in a manner consistent with requirements of the law.

## What Is Insurance Bad Faith?

The simplest definition of bad faith is when the insurance company puts its interests unfairly or unreasonably ahead of the interests of its insured. The tort of bad faith arises when the insurer "intentionally denies, fails to process or pay a claim without a reasonable basis." *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981). While an insurer may challenge claims which are fairly debatable, id., its belief in fair debatability "is a question of fact to be determined by the jury." *Sparks v. Republic Nat'l Life Ins. Co.*, 132 Ariz. 529, 539, 647 P.2d 1127, 1137 (1982) (emphasis added).

An insurance contract is not an ordinary commercial bargain; "implicit in the contract and the relationship is the insurer's obligation to play fairly with its insured." *Rawlings v. Apodaca*, 151 Ariz. 149, 154, 726 P.2d 565, 570 (1986). The insurer has "some duties of a fiduciary nature," including "[e]qual consideration, fairness and honesty." Id. at 155, 726 P.2d at 571. (Emphasis added) Thus, "an insurer may be held liable in a first-party case when it seeks to gain unfair financial advantage of its insured through conduct that invades the insured's right to honest and fair treatment," and because

-7-

of that, "the insurer's eventual performance of the express covenant-by paying the claim-does not release it from liability for 'bad faith.' " Id. at 156, 726 P.2d at 572. (Emphasis added).

A covenant of bad good faith and good dealing is implied in every contract for insurance under Arizona law. *Deese v. State Farm Mut. Auto. Ins. Co.*, 172  Ariz. 504, 509, 838 P.2d 1265, 1270 (1992). In *Deese*, 172 Ariz. at 508, 838 P.2d at 1269,  the Arizona Supreme Court noted that an insurance contract provides more than just security from financial loss to the insured. The Court said, "the insured also is entitled to receive the additional security of knowing that she will be dealt with fairly and in good faith." Id. Thus, if an insurer acts unreasonably in the way it processes a claim, it will be held liable for bad faith "without regard to its ultimate merits." Id. at 509, 838 P.2d at 1270 (emphasis added).

This requires the insurer to act in some measure as a fiduciary, giving the insured "equal consideration, fairness and honesty." *Rawlings v. Apodaca*, 151 Ariz. 149, 155, 726 P.2d 565, 571 (1986).   The insurer must "immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim." *Zilisch v. State Farm Mut. Auto. Inc. Co.*, 196 Ariz. 234, 238 995 P.2d 276, 280 (2000) "stating insurer must do nothing that would jeopardize the insured's security under the insurance policy."

Contrary to the assumptions of many insurance carriers, an insurer's payment of a claim "does not release it from liability for bad faith." *Noble v. Nat'l Am. Life. Ins. Co.,* 128 Ariz. 188, 624 P.2d 866 (1981) (emphasis added).   Rather, an insurer breaches the implied covenant of good faith, whether its pays or not, "when its conduct damages the very protections or security which the insurer sought to gain by buying insurance" Id. at 157, 726 P.2d 565, 726 P.2d at 573.

Couch on Insurance provides: "Implicit in the duty to investigate is the requirement that the investigation be adequate and fair.   Adequacy and fairness mean that the insurer has a duty to diligently search for evidence which supports insured's claim and not merely seek evidence upholding its own interests." 14 Couch on Insurance § 207:25, p. 207–41 (3d ed.2005).

## A Short History of the Appraisal Clause

*"One of the most important consumer-oriented provisions found in the Standard Fire Insurance Policy and most other property insurance policies today is the Appraisal Clause. In fact, in most jurisdictions, it is one of the only provisions that afford protection to the interests of the insured in equal measure to those afforded the insurer."*  Wilkofsky, Jonathon, *The Law and Procedure of Insurance Appraisal*, DPLP Publishing, 2003.

The appraisal clause in modern insurance policies can be traced back to the New York Standard Fire Policy which was originally enacted in 1853. It has been in its present form and used since 1943. Arizona, like many states, requires conformity with the New York Standard Fire Policy,

-8-

*"No policy of fire insurance covering property located in this state shall be made, issued or delivered unless it conforms as to all provisions and the sequence thereof with the basic policy commonly known as the New York Standard Fire Policy edition of 1943."* ARS 20-1503.

The New York Standard Fire Policy's Appraisal Clause states:

*Appraisal. In case the insured and this company shall fail to agree as to the actual cash value for the amount of loss, then, on the written demand of either, each shall select a competent and disinterested appraiser and notify the other of the appraiser selected within 20 days of such demand. The appraisers shall first select a competent and disinterested umpire; and failing for 15 days to agree upon such umpire, then on request of the insured or this company, such umpire shall be selected by a judge of a court of record in this state in which the property covered is located. The appraisers shall then appraise the loss, stating separately actual cash value and loss to each item; and, failing to agree, shall submit their differences, only, to the umpire. An award in writing, so itemized, of any two when filed with this company shall determine the amount of actual cash value and loss. Each appraiser shall be paid by the party selecting him and the expenses of appraisal and umpire shall be paid by the parties equally.*

The Appraisal process was designed to efficiently and cost effectively resolve disagreements as to value without resort to formal legal process. An insurance appraisal, unlike a judicial proceeding, involves a contractual agreement contained in the policy by which the parties agree to have a third person determine the amount of a loss or value of property. Rather than encompassing issues of liability, an insurance appraisal merely determines the value of a claim if the parties do not agree to its value. Ideally, appraisal should prevent long and costly court battles by providing a mechanism to fix damages when liability is not in dispute. See, Coughenour, Amy, APPRAISAL AND THE PROPERTY INSURANCE APPRAISAL CLAUSE--A CRITICAL ANALYSIS: GUIDANCE AND RECOMMENDATIONS FOR ARIZONA, 41 Ariz. St. L.J. 403, 2009. See, also, *Hanson v. Commercial Union Ins. Co.,* 150 Ariz. 283, 723 P.2d 101 (Ct. App. 1986) (Appraisal panel must act within the scope of its authority.)

Appraisal has been likened to arbitration and appraisal decisions in Arizona are given the same weight as arbitration decisions so long as the appraisal panel limits its deliberations to the amount of damages. In *Hirt v. Hervey,* 118 Ariz. 543, 578 P.2d 624 (App.1978), the Court rejected an argument that a broader scope of review should be applied to appraisals than to arbitrations holding:

*Arizona has no cases directly on point, but a review of cases from other jurisdictions reflects that the overwhelming weight of authority supports the view that decisions of an appraiser or other financial expert acting in the role of an appraiser are entitled to the same degree of finality accorded decisions of arbitrators.* 118 Ariz. at 545, 578 P.2d at 628.

As originally designed, appraisal was to be an expeditious and inexpensive alternative to litigating the amount of damages in an otherwise covered insurance claim. Appraisal panels, acting

-9-

within the scope of their authority, issue binding damage determinations which are to be given the same weight and authority as binding arbitrations.

### State Farm is Consistently Losing Appraisal Challenges Across the Country

Most of the cases listed here are trial court decisions and not binding in this action. However, these cases are illustrative of State Farm's losing efforts on this issue across the country.

A district court in *Basim Shina v. State Farm*, 2022 WL 989330 (E.D. Mich March 31, 2022), became the fifth court in Michigan alone to publish an opinion rejecting State Farm's position. The *Basim Shina* court concluded that appraisers were empowered to resolve all issues of fact relevant to determining the amount of loss caused by an admittedly insured event and cited *Smith v. State Farm*, 737 F. Supp. 2d 710-11 (E.D. Mich. 2010) (appraisers can determine what damages were caused by an insured loss event and what damage is unrelated); *Cox v. State Farm*, 2020 WL 1888824 at *7-8 (E.D. Mich. 2020) (same); *Hart v. State Farm*, 2021 WL 3709534 (E.D. Mich. Aug. 21, 2021) (same); *Laframboise v. State Farm*, 2022 WL 627147 (E.D. Mich. March 3, 2022) (same).

State Farm's continuing to keep litigating and losing the same argument in Michigan reflects an abuse of process that is playing out across the country. State Farm has litigated and lost the identical issue five times in the State of Tennessee as well.  See, *State Farm v. Harper*, 2022 WL 989088 at *6 (M.D. Tenn. March 31, 2022) (rejecting State Farm's argument that disputes over the scope of damage is a coverage issues because "defining the 'scope of work' is inherent in determining the value of the property damage" in an appraisal) (citing *Ingram v. State Farm* 2021 WL 6133771 (E.D. Tenn. Dec. 14, 2021); *Smith v. State Farm*, 2021 WL 5919025 (Dec. 15 2021); *Morrow v. State Farm*, 2022 WL 885863 (E.D. Tenn. March 22, 2022).  See also *State Farm v. Harper*, 2021 WL 6133774 (M. D. Tenn. August 13, 2021) ("a dispute over scope of the work is nothing more than a dispute over the monetary value of returning the insured premises to its pre-loss condition").

A Colorado Court also rejected State Farm's argument.  *Garcia v. State Farm*, 2021 WL 4439792 at * 4 (D. Colo. Sep. 27, 2021) ("a causation analysis is the type contemplated by the appraisal process.).   State Farm's arguments have also been rejected by appellate courts in Texas, See, *Johnson v. State Farm Lloyds*, 204 S.W. 3d 897, 902 Tex. App. 2006) ("once it is determined that there is a covered loss and a dispute about the amount of that loss, the appraisal process determines the amount that should be paid"); in Iowa, *North Glenn Homeowners Ass. v. State Farm*, 906 N.W. 2d 204 (App. Iowa 2017) (appraisers can properly resolve disputes over causation because "causation is an integral part of the definition of loss"); and in *Florida State Farm v. Licea*, 685 1285, 1288 (Fla. App. 1996) (an appraisal "necessarily includes determinations as to the cost of repair of repair or replacement and whether or not the requirement for a repair or replacement was caused by a covered peril").

-10-

State Farm remains undeterred by this long string of rejections and continues its efforts to obstruct the appraisal remedy here in Arizona. In another Arizona case involving a dispute over damages caused by a plumbing failure, State Farm refused to pay an appraisal award because State Farm disagreed with the appraisers' determination that the scope of loss included damage to the cabinets and flooring. State Farm made the exact same argument, as in all previous cases, that the appraisers exceeded their authority when they determined the extent of damage caused by the loss event. See, *Nelson v. State Farm*, Maricopa County Sup. Ct., Cas No. 2020-007110. In *Nelson*, Judge Coury followed the overwhelming precedent established by State Farm's own unsuccessful litigation efforts and confirmed the appraisal award in its entirety and awarded fees and interest. State Farm voluntarily paid the Judgment entered on the appraisal in Nelson but continues its campaign to relitigate the same issue in this case and others pending in Arizona courts.

Again, while Judge Coury's opinion did not set legal precedent, it is evidence of State Farm's willingness to repeatedly violate Arizona's Unfair Claims Practices statute and State Farm's actions provide prima facie proof of a pattern & practice of forcing its insureds who choose appraisal to go through every unnecessary legal mechanism available to enforce their rights. This comes at great expense to the insureds, as we can see, rarely recover what they are owed while simultaneously incurring the cost of appraisal.

In the instant case, the Les obtained both an opinion from Magistrate Judge Bowman and District Court Judge Rash, confirming the validity of the Les' appraisal award by statute. The Court can also see cases like *Seip v. Western Ag. Ins. Com*, CV-21-08261-PCT-DLR, where another Court in this same U.S. District Court affirmed an appraisal award under the same circumstances, rejecting the carrier's claims that the appraisal panel was wrongfully deciding issues of cause and coverage. The Court rejected that argument, reasoning that the insurance company's position if taken to its logical conclusion would "neuter" the appraisal remedy. The Court held:

> *Given this ambiguity,* **the Court construes, as it must, the provision against the insurer and finds that the provision empowers the appraisers and umpire to determine which losses were caused by the covered event and determine the damages arising from the losses. <u>This interpretation follows what appears to be a growing trend</u>.** *For example, the Tenth Circuit addressed a substantially similar appraisal provision and held that appraising a loss necessarily includes resolving the question of what caused the loss. Bonbeck Parker Case 3:21-cv-08261-DLR. LLC v. Travers Indem. Co., 14 F.4th 1169, 1177 (10th Cir. 2021).* **The court explained that a review of several dictionaries revealed that all definitions of the word "loss" included a "causation component," making it "clear that 'loss' refers to damage resulting from a covered event."** *Id. at 1178. As such, the panel allowed the appraisers in that case to determine whether damage to a roof was caused by a covered event—here a hailstorm—or something else. Id. at 1179-80. The Court agrees*

-11-

*with the Tenth Circuit's rationale. Both parties agree that the appraisers determined which damages were caused by the snowstorm. Consequently, the appraisers acted within the authority granted to them by the Policy. Having done so, their determination is "binding" under the Policy.* (Emphasis added).

Despite the foregoing, State Farm continues with its refusal to pay the Les in accord with the appraisal award.  This refusal to pay the award is a violation of the applicable standards of care discussed below, fits into a pattern of practice at State Farm, and effectively frustrates  the entire purpose of the appraisal process as described in the Les' insurance policy.

## Recent Arizona State Farm Appraisal Matters

- Larson - 1753 W. Devonshire Avenue, Phoenix. The Larson's sustained a plumbing loss which State Farm estimated at $6553. The Larson's disagreed with this estimate and demanded appraisal. One year and nine months after the loss, the Appraisal Panel entered an award of $46,866. **(715% over State Farm's initial estimate.) Adam Salene was State Farm's appointed appraiser and refused to sign the award.** At the outset of the case, State Farm refused appraisal. Its attorney, Jennifer Boldi, insisted State Farm had the right to choose the Scope of Damage. Rather than paying the Appraisal Award, State Farm deducted $30,719 from the total amount of the award, refusing to honor and significant portions of the award. DOL: 12/1/19. Final Appraisal Award: 9/122/21 (1 year and 9 months after loss).

- Garroll White and Jessica Titius. 665 N. Mountain View Rd., Star Valley, Arizona. This couple, with four young children, suffered a major water loss in a house which also contained a significant amount of asbestos materials. State Farm estimated the loss at $9147 ACV and refused to place any value on the couple's personal property. State Farm also refused to provide alternative housing to the family for more than just over one week even though the home had no portable kitchen and was frequently contaminated with asbestos. The family was forced to live in the yard for a period of time after the asbestos contamination was confirmed. The family demanded appraisal. The final appraisal award came in at $171,824 ACV **(1878% over State Farm's initial estimate)** and $42,092 ACV on the contents. **Adam Salene was State Farm's appointed appraiser and refused to sign the award.** State Farm refused to pay anything for asbestos remediation and related work caused by the covered loss and refused to offer anything on the contents claiming, "questions of coverage." The DOL was January 9, 2019, with the final appraisal award being entered on December 28, 2022  (2 years and 11 months after the loss.)

- Hanns - 8459 E. Wind Runner Dr., Scottsdale, AZ. This property is an Air B&B owned by Schwan Hanns. The property suffered a water loss on July 8, 2020. State Farm estimated the loss at $42,498 ACV. State Farm offered nothing for the contents. Appraisal was demanded. The final appraisal award was signed on March 28, 2021 (1 year and 8 months after the loss.)

-12-

placing damages at $90,328 ACV dwelling (213% of SF) (RCV $106,298) and $19,683 ACV on the contents. The award was **213% over State Farm's original estimate. Adam Salene was State Farm's appointed appraiser and refused to sign the award.** State Farm made a partial payment more than three months after the date of the award, deducting a total of $46,991 from dwelling payments and continue to offer nothing for the contents beyond $2291 which was paid during the appraisal process.

- Mateus - 6431 W. Mountain View Rd. Glendale. This claim involved a plumbing failure which occurred on November 16, 2020. State Farm initially estimated the loss at $7058 ACV and zero dollars on contents. Appraisal was demanded. The appraisal award, signed on February 7, 2022 (1 year and 3 months after the date of loss), came in at $99,415 ACV on the dwelling **(1409% over State Farm's initial estimate)** and $6837 ACV on contents. **Adam Salene was State Farm's appointed appraiser and refused to sign the award.** State Farm alleges a prior event, despite no evidence of such, and deducts a total of $47,509 from its payment, paying only $51,685. Of course, this is still about eight times more than State Farm's original estimate. A partial payment was made on contents.

- Mitchell/Anctil - 989 W. Dancing Rain Court, Oro Valley, Arizona. This case involved a water loss which occurred on December 1, 2020. State Farm's initial estimate was $50,988 RCV with nothing being allotted for contents. Appraisal was demanded. During the pendency of the adjustment, State Farm refused to extend alternative living arrangements to the family despite having awarded absolutely nothing for contents. A partial appraisal award was entered on June 2, 2022 (1 year and year and months after the date of loss) and a final consolidated award $293,392 **(575% over State Farm's initial estimate)** was entered on February 14, 2023 (2 years and 2 months after the date of loss.) **Adam Salene was State Farm's appointed appraiser and refused to sign the award.** State Farm refused to pay the entire award deducting a total of $120,022 from its total payment paying just $39,422. State announced on March 14, 2023, that it was paying the Dwelling facet of the appraisal award and loss of use determinations by appraisal panel but is still refusing to pay the personal property facet of the app award.

- Sherry and Mike Nelson - 18119 E. Vallejo St., Gilbert, AZ. This property suffered two separate plumbing failures resulting in water losses. In the first loss, State Farm estimated the damages at $19,020 ACV and the second loss at $4712 ACV. Appraisal was demanded in both instances. The appraisal award on the first claim came in at $102,129 RCV and $97,253 **ACV (511% over State Farm's initial estimate)** with the final appraisal award entered on May 14, 2020,(3 years and 2 months after the first loss.) State Farm ultimately deducted $31,625 from the dwelling award and $3698 on the contents award, once again alleging coverage issues. **Adam Salene was State Farm's appointed appraiser and refused to sign the award.** Judge Christopher Coury ultimately found in favor of the Nelsons making a substantial award which included $25,000 in interest in $52,000 in attorney's fees.

-13-

- Flesher - Lisa & Malachi Flesher only home at 962 E. Beck Ln. in Phoenix, AZ. On January 25, 2021, the Flesher's home sustained significant wind damage. State Farm acknowledged that the Flesher's damages were covered though it initially valued the claim at $7326.12. The Flesher's, through their retained public adjuster, disagreed with that loss valuation with the Fleshers ultimately invoking the Appraisal Clause in their policy. On December 2, 2021, the appraisal panel set the value of the Flesher's loss at $40,590.70 on a replacement cost value basis, and after applying depreciation, $34,418.97 on an actual cash value basis. **David Loucado was State Farm's appointed appraiser and refused to sign the award**. State Farm refused to pay the award in its entirety and attempting to nullify the value determinations made by the appraisal panel by offering $7282 as replacement cost, undercutting the award by $33,308.70.

- Heartland - 2757 N Sterling, Mesa, AZ 85207. On August 14, 2021, Maribel Heartland sustained storm damage to her Mesa residence. State Farm estimated the loss at $9234.18. Ms. Heartland demanded appraisal with an appraisal award being entered on October 26, 2022, (1 year and 2 months after the loss) in the amount of $23,920.12. As in all the cases referenced above, State Farm ignored the binding appraisal award for $23,035.02, substituting its investigator's own judgment and reducing the amount to be paid by State Farm to $9234.18. **David Combs was State Farm's appointed appraiser and refused to sign the award.**

### State Farm's Prior Inconsistent Positions on Appraisal

State Farm has taken a diametrically opposed position in support of the binding nature of appraisal decisions in prior pleadings before this court when the appraisal result suited State Farm's interests. In *Jasem v. State Farm Fire and Casualty Company*, CV 06-595-PHX-DGC, State Farm, through attorneys James R. Broening and Wm. Rinaudo Phillips, senior partners at the law firm of Broening Oberg Woods & Wilson, filed a *Motion to Confirm Appraisal Award and Dismiss Claims Re Amount of Building Repair Loss* wherein State Farm vigorously argued:

- The Insurance Contract Mandates Appraisal.

- The Federal Arbitration Act Was Applicable to Contractually Required Appraisal.

- Public Policy Favors Appraisals.

- Appraisal Awards Are Final and Conclusive.

- The Vast Majority of Courts Hold Appraisal Awards Are Final and Conclusive.

- Federal Law Provides No Grounds for Opposition to Appraisal.

-14-

State Farm's Motion to Confirm is well-written, supported with abundant case law, and quite persuasive. In *Jasem*, the parties were dealing with damages resulting from a structural fire. State Farm had estimated the loss at $87,721.84. Jasem alleged the loss exceeded the $140,000 limits of his insurance policy. State Farm demanded appraisal. The appraisal panel ultimately issued an award placing the damages at $10,228.70 over State Farm's initial estimate but significantly lower than what the insured was requesting. State Farm paid the additional amount in full bringing the total building repair costs to $97,950.54. State Farm moved to confirm the appraisal award with arguments virtually identical to those of the Les.

Ironically, in its Motion, State Farm specifically noted that appraisal has been used "for over 100 years" to help quickly and expeditiously resolve differences between parties to an insurance claim over damage amounts. State Farm noted:

*An appraisal provision provides a method for establishing the dollar value of damage sustained.* ***Such a provision is justified in the expectation that it will provide a plain, inexpensive and speedy determination of the extent of the loss.*** (Emphasis added)

State Farm went on to argue both federal law and public policy strongly favor the binding nature of appraisal awards stating:

*Consistent with the strong public policy favoring arbitration, appraisal awards are final and conclusive absent fraud, mistake or other compelling circumstances… Under the FAA, review of arbitration decisions is "both limited and highly deferential."… Courts are required to uphold arbitration awards for the arbitrator even arguably construed or implied contract and acted within the scope of his authority"*

*The primary reason the parties resort to arbitration is to gain the benefit of a quicker, easier dispute resolution process. These benefits would be radically diminished if courts readily entertained public policy challenges to arbitral awards. The finality of arbitral awards must be preserved if arbitration is to reach a desirable alternative to courtroom litigation.* State Farm Motion at pgs. 5&6. (Citations omitted.)

State Farm concludes its argument as follows:

*Appraisal awards are strongly favored for compelling public policy reasons. Such awards are subject to severely constrained judicial review. There exist no grounds upon which to deny confirmation of the appraisal award. The award should be confirmed, plaintiff should be prevented from disputing building repair cost damages, and all claims relative to the amount of the structural loss should be dismissed.*

For the convenience of the reader, I have attached the entire State Farm Motion as Exhibit 1 to this Report. There have been no significant changes in the case law since this motion was drafted

-15-

and it is clear that, at least as of 2007 (and when the facts favor State Farm), State Farm takes a completely different position on the binding nature of appraisal awards.

## Analysis and Opinions

I have been asked to review the above-listed documents, case law & facts and provide my opinions regarding State Farm's handling of the Les' loss. These opinions are based on my experience and training as an attorney with over 34 years of experience working both for the insurance industry in both a claims and coverage capacity, my additional training in claims adjusting, my knowledge of statutory and regulatory standards applicable to property and casualty claim handling, my review and knowledge of claim handling requirements, the many documents I have reviewed in this and other cases, and my review and knowledge of texts, literature, and articles discussing claim handling. I am qualified by training and experience to provide the opinions I am expressing herein.

### The Initial Claim Process

State Farm has acknowledged from the outset of this matter that the Les' claim is a covered loss. Accordingly, State Farm of the duty to the Les to fully and fairly investigate all aspects of the claim in a timely manner and promptly pay the claim. The loss was reported on May 1, 2020. State Farm's file notes indicate it performed an initial inspection on May14, 2020. SF Bates # 001311. Pursuant to State Farm's initial estimate, it made a net actual cash value payment to the Les of $61,358.81

Early in the claim process, the Les retained Associated Adjustment Bureau and its principals, John McDougall and Dan Townsend, to independently estimated the loss and represent the Les moving forward. Both individuals are long-time licensed Arizona insurance adjusters. Associated presented a Proof of Loss to State Farm on July 22, 2020, detailing the damages associated with the fire. Associated estimated replacement cost value damages as to the dwelling at $182,608.42, and after depreciation and application of the claim deductible, $171,092.33 on an actual cash value basis.

In response, State Farm objected to the Associated Proof of Loss arguing that a number of items were not damaged by the fire (repeatedly referencing "hard living") and therefore not subject to payment. Despite the clear evidence of extensive smoke damage throughout the structure including saturation of the HVAC ductwork, State Farm remained insistent on its refusal to consider the full extent of the smoke damage which was clearly caused by the fire loss. From the time State Farm received Associated's Proof of Loss in July 2020 until appraisal was demanded on December 28, 2020, State Farm had five months to properly investigate and pay the claim.

The parties went back and forth for months with Associated repeatedly sending additional support for both the damage numbers and documentation of lost rents. The original Proof of Loss contained documentation for the rental history of the property including evidence of automatic withdrawals continuing up through the month prior to the fire. The property was leased through the

-16-

end of April with $1200 per month payments received through March and the last month's rent on the existing lease withheld from the security deposit with the lessor's permission for April. State Farm's Rental Clause states:

> *Fair Rental Value. If a Loss Insured causes that part of the residence premises rented to others **or held for rental by you** to become uninhabitable, we cover its fair rental value. Payment shall be for the shortest time required to repair or replace the part of the premises rented or held for rental but not exceeding 12 consecutive months from the date of loss. This period of time is not limited by expiration of this policy. Fair rental value shall not include any expense that does not continue while that part of the residence premises rented or held for rental is uninhabitable.(Emphasis added).*

On multiple occasions, State Farm demanded, and was supplied with, proof of rental including the amount of rental and a history of rental for the property. The file is filled with examples:

- In the Proof of Loss dated July 22, 2020, electronic deposits showing the history of rental for the property were attached.
- In a letter dated September 4, 2020, from John McDougall to John Peard at State Farm, Mr. McDougall once again reiterated the lost rents referencing the deposits produced with the initial Proof of Loss.
- On October 2, 2020, Mr. McDougall sent a letter to State Farm adjuster Chris Keegan re-attaching a copy of the electronic banking deposits first produced with the original Proof of Loss.
- January 20, 2021, Mr. McDougall, once again, this time to State Farm attorney Jennifer Boldi,
  once again submitted the deposit records and additional documents in support of the lost rental claim.
- January 21, 2021, Ms. Boldi, responded to Mr. McDougall demanding additional evidence of lost rents.
- On November 2, 2021, Ms. Boldi, in an email to John McDougall, was still requesting additional information stating that State Farm had not received "the requested executed **lease *or a Schedule E*** to show business interest sufficient to warrant paying lost rents.
- Mr. McDougall, in response to Ms. Boldi's request, forwarded Ms. Les' Schedule E,s from 2019-2020 reporting the rental income for the property and establishing that the property was regularly rented. **Ms. Boldi acknowledged receipt of the Schedule E's** in correspondence dated November 17, 2021.

State Farm continued to deny payment for the vast majority of damages and stood by its refusal to pay lost rents. On December 28, 2020, the Les demanded appraisal pursuant to the specific terms of their policy.

State Farm owed the Les a duty to "immediately conduct an adequate investigation, act reasonably in evaluating the claim, and act promptly in paying a legitimate claim." *Zilisch v. State*

-17-

*Farm Mut. Auto. Inc. Co.*, 196 Ariz. 234, 238 995 P.2d 276, 280 (2000). "Implicit in the duty to investigate is the requirement that the investigation be adequate and fair. Adequacy and fairness mean that the insurer has a duty to diligently search for evidence which supports insured's claim and not merely seek evidence upholding its own interests." 14 Couch on Insurance § 207:25, p. 207–41 (3d ed.2005).

From the outset of the claim, State Farm was faced with a dispute as to what damage was attributable to the covered event. Despite clear evidence of extensive smoke damage throughout the property, State Farm focused almost exclusively on what it labeled "hard living" damages to the structure and contents. There is no "hard living "exclusion in the policy. What State Farm has failed to acknowledge is, regardless of the alleged "hard living" damages, the extensive smoke damage impacted the entire property which is reflected in the Associated estimate and the final Appraisal Award.

In June 2020, State Farm did hire a company called *RiskNomics, Economically Managing Risk*, with its headquarters in Henderson, Nevada, to inspect the property. RiskNomics appears to be basically an industrial hygiene company though its Report, mistakenly dated June 28, 2010, addresses everything from physical and structural damage to commenting on coverage issues. Unlike Mr. McDougall and Mr. Townsend, it does not appear that any of the people from RiskNomics involved in this evaluation are licensed Arizona adjusters. RiskNomics title includes the phrase, "Economically Managing Risk". In the instant case, the RiskNomic's Report appears to be largely a vehicle for undercutting the Associated Estimate by a company which caters to the insurance industry..

State Farm relies upon *Hanson v. Commercial Union Ins. Co.*, 150 Ariz. 283, 723 P.2d 101 (Ct. App. 1986), and appraisal case for the appraisal award was not upheld the Court of Appeals because the panel straightened coverage issues and attempted to award attorney's fees, costs and other items outside of the appraisal panel's authority. *Hansen* is easily distinguishable from the instant case in that the appraisal panel was very specific that it was only appraising the damages caused by the fire loss. State Farm's attempts to define damage determinations as coverage issues is nothing new. It has made and lost this argument in multiple jurisdictions. *Smith v. State Farm,* 737 F. Supp. 2d 710-11 (E.D. Mich. 2010) (appraisers can determine what damages were caused by an insured loss event and what damage is unrelated); *Cox v. State Farm*, 2020 WL 1888824 at *7-8 (E.D. Mich. 2020) (same); *Hart v. State Farm,* 2021 WL 3709534 (E.D. Mich. Aug. 21, 2021) (same); *Laframboise v. State Farm*, 2022 WL 627147 (E.D. Mich. March 3, 2022) (same).

State Farm's actions fell below the accepted standard of care in the adjustment of this loss by, among other things, refusing to consider evidence of the extensive nature of the fire damage throughout the structure including the smoke saturation. Rather, State Farm blamed the bulk of damages on something it terms "hard living" which is not even a recognized insurance term. To justify its position, State Farm retained RiskNomics, a company not licensed to adjust insurance losses in Arizona, to attempt to legitimize its unreasonably low estimate.  State Farm's initial estimate of damages can only be described as a lowball offer based on a self-serving, limited interpretation of the

-18-

evidence. Far from "diligently search for evidence supporting the insured's claim", State Farm was solely focused on seeking and, in fact, creating "evidence" to further its own interests at the expense of its insureds. The bottom line is this case is always been about what was damaged by the covered event and what was not damaged by the covered event which is exactly what the appraisal panel determined. State Farm's actions must be seen as deliberate given the amount of times it has tried and lost this issue.

State Farm's refusal to pay anything for lost rents despite repeatedly receiving evidence of the prior rental history of the property is further evidence of State Farm unfairly and unreasonably placing its interests ahead of those of the Les. In doing so, State Farm's actions fell below any acceptable standards of care in the insurance industry and deprived the Les of the very security they thought they purchased with their policy. With the property extensively damaged, the Les were left hanging by State Farm's initial lowball estimate and payment which was not nearly enough to repair the property and get it back into a leasable condition. There is not a single word in the rental coverage clause which supports State Farm's position on denial. Again, State Farm is knowingly depriving its insured both the security and coverage the Les paid for with their policy premiums.

Ultimately, State Farm's actions forced the Les to invoke the appraisal process and incur the related costs and fees that process entails. Rather than simply paying a legitimate claim, State Farm is continuing to force  its insureds to jump through every possible legal "hoop and hurdle" to recover what they are owed pursuant to the terms of their insurance policy.

**Appraisal Issues**

> *"When you repeat a mistake, it is not a mistake anymore: it is a decision."*
>
> — *Paulo Coelho*

In recent years, State Farm has declared war on the appraisal process with no legal justification to do so. Clearly, there is a financial incentive to State Farm's refusal to pay claims. Every case discussed in this Report involves claims where State Farm under-adjusted/lowballed its estimates in a blatant attempt to force its insureds to accept less than what they are owed under their policy. State Farm does this while simultaneously delaying the claim and increasing the financial and emotional stress on the insureds as leverage. The numbers are shocking. In the eight Arizona cases referenced above, State Farm's cumulative initial actual cash value estimates total $156,536. The cumulative amount of the actual cash value appraisal totals $1,013,953.09. There is good money in refusing to pay legitimate awards.

State Farm's refusal to pay legitimate appraisal awards nationwide, throughout Arizona, and in this case, despite repeatedly losing the issue in litigation, is evidence of a pattern & practice by State Farm to undercut the appraisal process. In fact, recent discovery has revealed that State Farm has created an independent Central Investigation Unit in Texas which oversees all non-fire related appraisal claims in the country. State Farm's "investigators" retroactively apply depreciation and

-19-

exclusions to appraisal awards on cases they have not adjusted, for properties they have not inspected, in states where they don't know the contracting laws. State Farm does this with the absolute knowledge that refusing to pay appraisal awards places its insureds, including the Les in a financially compromised position which increases the likelihood that insureds will accept less than what they are owed under the terms of their policy. Moreover, State Farm knows its repeated challenges of these awards are not legally warranted given its past history on these issues.

In the instant case, State Farm inserted its attorneys into the process as soon as appraisal was demanded. The claims file is filled with redacted communications between defense attorney Jennifer Boldi and the Les' adjusters at Associated. It is clear from these communications that State Farm intended from the outset of an appraisal demand to begin the process for denying the ultimate award. This is in sharp contrast to State Farm's litigated positions on these issues just a few years ago.

State Farm's attorneys, Broening and Phillips did an outstanding job of explaining the binding nature of the appraisal process in their 2007 Motion to Confirm in *Jasem v. State Farm Fire and Casualty Company*, CV 06-595-PHX-DGC. In *Jasem,* State Farm correctly argued:

> *Consistent with the strong public policy favoring arbitration, appraisal awards are final and conclusive absent fraud, mistake or other compelling circumstances… Under the FAA, review of arbitration decisions is "both limited and highly deferential."… Courts are required to uphold arbitration awards for the arbitrator even arguably construed or implied contract and acted within the scope of his authority."*

> *The primary reason the parties resort to arbitration is to gain the benefit of a quicker, easier dispute resolution process. These benefits would be radically diminished if courts readily entertained public policy challenges to arbitral awards. The finality of arbitral awards must be preserved if arbitration is to reach a desirable alternative to courtroom litigation. State Farm Motion at pgs. 5&6. (Citations omitted.)*

State Farm's actions in the instant case stand in stark contrast to its position in *Jasem.* In fact, State Farm's actions in recent years, on a nationwide basis and, as we have seen in Arizona, illustrate a 180° change of direction in State Farm's approach to appraisal. State Farm has turned what was supposed to be "a quicker, easier dispute resolution process" into a tool for delay and abuse. By wrongly insisting the legitimate determination of damages creates "coverage issues", State Farm has created an environment where it can, and literally does, simply refuse to pay Appraisal Awards. State Farm's appraisers refused to sign off on a single appraisal discussed in this Report. This gives State Farm an "open-door" to raise coverage issues which simply do not exist. As a result, the appraisal process which used to take months can now be dragged out well over a year or more and still not resolve anything.

-20-

### Opinions

State Farm's actions in adjusting this loss below acceptable standards of care. Specifically:

- State Farm failed to acknowledge and act reasonably promptly upon communications with respect to the claims arising under its insurance policy in this case.
- State Farm failed to adopt and implement reasonable standards for the prompt investigation of this claim including its refusal to look at or even consider evidence of lost rents and then demanding evidence not required by the policy as justification for refusal to extend payment.
- State Farm not only compelled the insureds to initiate appraisal, but it also then offered substantially less than the appraisal panel lawfully awarded in an attempt to force its insureds to settle the claim for less than the amount owed.
- State Farm insisted on ignoring smoke damage and fire-related damage instead classifying damages as caused by "hard-living" understanding that fire damages are covered and wear and tear is not. Liability was clear under one portion of the policy, but State Farm chose to deny coverage under a separate exclusion to the financial and emotional detriment of its insureds.
- State Farm's actions were carried out with absolute knowledge of the financial and emotional stress it was causing the Les as evidenced by numerous communications throughout the file.
- State Farm's actions nationwide and in Arizona are evidence of a clear pattern & practice to intentionally avoid and frustrate the intended purpose of the appraisal clause which, as State Farm argued in 2007, was intended to provide a speedy, inexpensive and complete resolution on damage determinations.

### <u>Conclusion</u>

As more fully discussed above, State Farm, throughout the pendency of this claim and litigation, has placed its interests unreasonably and unfairly ahead of those of the Les. I understand this is an active case. Depositions and discovery are ongoing. I reserve the right to supplement this report as necessary on receipt of any additional relevant information.

Sincerely,

**JOSEPH W. WATKINS, P.C.**

Joseph W. Watkins

# EXHIBIT 1

LAW OFFICES
BROENING OBERG WOODS & WILSON
PROFESSIONAL CORPORATION
POST OFFICE BOX 20527
PHOENIX, ARIZONA 85036
TELEPHONE: (602) 271-7700
FACSIMILE: (602) 258-7785

James R. Broening/Bar No. 004036
  E-mail: jrb@bowwlaw.com
Wm. Rinaudo Phillips/Bar No. 019949
  E-mail:  wrp@bowwlaw.com
Attorneys for Defendant State Farm Fire and
Casualty Company

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| EMAD JASEM, | 06-595-PHX-DGC |
| Plaintiff, | **MOTION TO CONFIRM APPRAISAL AWARD AND DISMISS CLAIMS RE AMOUNT OF BUILDING REPAIR LOSS** |
| v. | |
| STATE FARM FIRE AND CASUALTY COMPANY, | ***(Oral Argument Requested)*** |
| Defendant. | |

    Defendant State Farm Fire and Casualty Company ("State Farm"), pursuant to 9 U.S.C. §13, hereby moves this Court for an order confirming the Appraisal Award herein and dismissing claims re amount of building repair loss, for the reasons set forth in the subjoined Memorandum of Points and Authorities, the Statement of Facts filed herewith, the Exhibits and the entire record herein.

## **TABLE OF CONTENTS**

Page

I.    FACTUAL BACKGROUND ................................................................................2

II.   APPLICABLE LAW ........................................................................................3

    A.    Plaintiff's Insurance Contract Mandates Appraisal ...........................................3

    B.    Application of Federal Arbitration Act ............................................................4

    C.    Public Policy in Favor of Appraisals..............................................................5

    D.    Appraisal Awards are Final and Conclusive ....................................................5

    E.    Vast Majority of Courts Hold Appraisal Awards Are Final and Conclusive..6

    F.    No Grounds for Opposition Under 9 U.S.C. § 10 .............................................8

III.  CONCLUSION ................................................................................9

1

## TABLE OF AUTHORITIES

2

3

4    **Cases**

5    *A. G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1404 n.2 (9th Cir. 1992) .................... 9

6    *Appalachian Ins. Co. v. Rivcom Corp.,* 130 Cal.App. 3d 818, 182 Cal. Reporter 11, 14 (1982).... 12

7    *Arizona Electric Power Coop., Inc. v. Berkeley,* 59 F.3d 988, 992 (9th Cir. 1995) ........................ 10

8    *Atlas Construction Co., Inc. v. Indiana Ins. Co. Inc.,* 160 Ind. App. 33, 309 N.E.2d 810 (1974)... 11

9    *Barnes v. Western Alliance Ins. Co.,* 844 S.W. 2d 264, 267 (Tex. App. 1994).............................. 11

10    *Brethren Mutual Ins. Co. v. Filsinger,* 54 Md. App. 357, 458 A.2d 880, 884 (1983).................... 12

11    *Cohen v. Webbush, Noble, Cooke, Inc.,* 841 F.2d 282, 285 (9th Cir. 1988)........................................ 8

12    *Coutee v. Barington Capital Group, L.P.,* 336 F.3d 1128, 1132 (9th Cir. 2003) ............................. 9

13    *Dealers Mut. Fire Ins. Co. v. Glidden Co.,* 284 U.S. 151, 159, 52 S.Ct. 69, 71, 76 L.Ed.

14        214 (1931)………………………………………………………………………………………10

15    *Einhorn v. Valley Medical Spec.,* 172 Ariz. 571, 838 P.2d 1332 (App. 1992) ............................... 11

16    *Emmons v. Lake States Ins. Co.,* 193 Mich.App. 460, 484 N.W.2d 712, 715 (1992) ................... 11

17    *Empresa Constr. Contex Limitada v. Iseki, Inc.,* 106 F.Supp 2d 1020, 1024 (S.D. Cal. 2000) ...... 10

18    *Equity Mutual Ins. Co. v. Campbell,* 886 S.W.2d 221 (Mo. 1994) ................................................. 11

19    *FDL, Inc. v. Cincinnati Ins, Co.,* 135 F.3d 503 (7th Cir. 1998)...................................................... 10

20    *Fisher v. National General Insurance Co.,* 192 Ariz. 366, 965 P.2d 100 (App. 1998)................. 11

21    *Funk v. Funk,* 6 Ariz.App. 527, 434 P.2d 529 (1968) .................................................................... 11

22    *G.C. and K.B. Investments, Inc. v. Wilson,* 326 F.3d 1096, 1105 (9th Cir. 2003)............................ 9

23    *High Country Arts and Craft Guild v. Hartford Fire Ins. Co.,* 126 F.3d 629, 633 (4th Cir. 1997).. 10

24    *Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261 (2nd Cir. 1997) ............................................ 11

25    *Jupiter Aluminum Corp. v. Holm Ins. Co.,* 52 F.Supp 2d 885, 888 (N.D. Ill. 1999).................... 11

26    *Kavli v. Eagle Star Ins. Co.,* 206 Minn. 360, 288 N.W. 723 (1939)................................................. 8

*Keesling v. Western Fire Ins. Co.,* 10 Wash. App. 841, 520 P.2d 622, 625 (1974)....................... 8

*Lapine Technology Corp. v. Kyocera Corp.,* 130 F.3d 884, 888 (9th Cir. 1997) ............................. 9

*Meyer v. State Farm Fire & Casualty Co.,* 85 Md. App. 83, 582 A.2d 275 (1990) ......................... 8

*Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42
   (1983)......................................................................................................................................... 8

*Pacific Reinsurance v. Ohio Reinsurance,* 935 F.2d 1019, 1024 (9th Cir. 1991) ............................ 9

*Palozie v. State Farm Mutual Auto. Ins. Co.,* 1996 WL 814533, *2 (D. Ariz. 1996) ...................... 8

*Park Imperial, Inc, v. E.L. Farmer Construction Co.,* 9 Ariz.App. 511, 454 P.2d 181 (1969)....... 11

*Raytheon Co. v. Rheem Mfg. Co.,* 322 F.2d 173 (9th Cir. 1963) .................................................... 8

*Shearson/American Express, Inc. v. McMahon,* 42 US 220, 226, 107 S.Ct. 2332, 2337 (1987) ...... 9

*Sheet Metal Workers' Int'l Ass'n v. Madison Indus., Inc.,* 84 F3d 1186, 1190 (9th Cir. 1996)........9

*Smitty's Super-Value, Inc. v. Pasqualetti,* 22 Ariz.App. 178, 525 P.2d 309 (1974)...................... 11

*Transnational Insurance Co. v. Simmons,* 19 Ariz.App. 354, 507 P.2d 693 (1973) ...................... 11

*Verdix Steel & Construction Co. v. Board of Supervisors,* 19 Ariz. 547, 509 P.2d 240 (1973)...... 11

*Wailua Associates v. Aetna Cas. & Sur. Co.,* 27 F. Supp, 2d 1211, 1214 (D. Haw. 1998).............. 8

**Statutes**

9 U.S.C. §10..................................................................................................................................... 12

**Treatises**

2 S. Cozen, *Insuring Real Property* § 30.05 (1992) ........................................................................ 12

Appleman & J. Appleman, *Insurance Law and Practice* §§ 3921, 3924 (1972) ............................ 12

*Couch on Insurance* § 213:1-3 (3rd Ed. 2000) ............................................................................... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.        FACTUAL BACKGROUND**

This case arises out of a fire that occurred at Plaintiff's rental dwelling on January 8, 2004.[1]  The dwelling was insured by the Defendant.[2]  Defendant investigated the loss, estimated the amount of building repair damages and paid Plaintiff $87,721.84 for the loss to the building.[3]

In January 2006, Plaintiff initiated this lawsuit alleging, in part, that his building loss exceeded the $140,000 limits of his insurance policy.[4]  Since Plaintiff's insurance policy contained an appraisal provision,[5] Defendant invoked the provision and demanded that the amount of Plaintiff's building loss be set by appraisal.[6]

In April of 2006, the parties filed a Joint Motion to Stay Action Pending Appraisal.[7] Approximately one month later, Defendant filed its Motion to Compel Appraisal and Stay Proceedings.[8]  In the Case Management Order, the Court granted Defendant's Motion to Compel Appraisal and ordered Plaintiff to designate his appraiser within fifteen days.[9]

In August of 2006, the Court held a discovery conference call with counsel.  The Court again ordered Plaintiff to designate an appraiser, and gave Plaintiff an additional five days to make such designation.[10]  Plaintiff appointed Arthur Gaudette as appraiser and the two appraisers subsequently appointed attorney Alan Goldman to act as umpire for the appraisal.[11]  To comply with the Court's Order that the appraisal be completed by December 6, 2006, Mr. Goldman scheduled a meeting with the appraisers to occur on

---

[1]  Defendant's Statement of Facts (SOF) in Support, ¶ 4
[2]  *Id* at ¶ 1
[3]  *Id* at ¶ 5
[4]  *Id* at ¶ 6
[5]  *Id* at ¶ 3
[6]  *Id*  at ¶7
[7]  *Id* at ¶ 8
[8]  *Id* at ¶ 9
[9]  *Id* at ¶ 10
[10]  *Id* at ¶ 11
[11]  *Id* at ¶ 12

1  December 4, 2006.[12]

2        On December 4, 2006, Mr. Goldman and appraiser Paul Watkins signed the

3  Appraisal Award setting out the replacement cost value for the cost to repair Plaintiff's

4  dwelling as a result of the fire loss.[13] By letter of December 5, 2006, Mr. Gaudette

5  explained his efforts undertaken as Plaintiff's designated appraiser herein.[14] On December

6  28, 2006, State Farm paid Plaintiff an additional $10,228.70, bringing the paid total

7  building repair costs to $97,950.54.[15]

8        With this factual scenario as background, this case presents the issue of whether

9  Plaintiff can now contest the appraised amount of his building repair loss.

10 II.        **APPLICABLE LAW**

11     A.    **Plaintiff's Insurance Contract Mandates Appraisal**

12        Plaintiff's insurance contract contains condition for, **Appraisal.** The provision

13 reads, in part, as follows:

14        If you and we fail to agree on the amount of loss, either one
           can demand that the amount of the loss be set by appraisal. If
15         either makes a written demand for appraisal, each shall select
           a competent independent appraiser . . .[t]he two appraisers
16         shall then select a competent, impartial umpire.  If the two
           appraisers are unable to agree upon an umpire within 15 days,
17         you or we can ask a judge of a court of record . . .to select an
           umpire.  The appraisers shall then set the amount of the loss.
18         If the appraisers submit a written report of an agreement to us,
           the amount agreed upon shall be the amount of the loss. If the
19         appraisers fail to agree within a reasonable time, they shall
           submit their differences to the umpire.  Written agreement
20         signed by any two of these three shall set the amount of the
           loss.

21                                    ***

22        As indicated above, State Farm demanded appraisal of Plaintiff's building repair

23 damages on March 7, 2006.  An appraisal award, signed by one of the appraisers and the

24

25 _____
   [12] *Id* at ¶ 13
26 [13] *Id* at ¶ 14
   [14] *Id* at ¶ 15
   [15] *Id* at ¶ 16

                                    - 3 -

1    umpire, was executed on December 4, 2006.  In accordance with the terms of the policy,

2    this award "set the amount of the loss."

3         Appraisal provisions in fire insurance contracts have been commonplace for

4    decades.

5              For over 100 years, it has been common – indeed standard –
              for fire insurance policies to contain a clause requiring
6              disputes concerning the amount of a covered loss suffered by
              the insured to be resolved through an appraisal process. Such
7              a clause is at issue here.  It provides, in relevant part, that, if
              the company and the insured are unable to agree on the
8              amount of loss, either one can demand that the amount be
              determined by appraisal.

9

10   *Meyer v. State Farm Fire & Casualty Co.,* 85 Md. App. 83, 582 A.2d 275 (1990).  The

11   provisions are frequently heralded for their ability to provide efficient dispute resolution.

12             An appraisal provision provides a method for establishing the
              dollar value of damage sustained.  Such a provision is
13             justified in the expectation that it will provide a plain,
              inexpensive and speedy determination of the extent of the
14             loss.

15   *Keesling v. Western Fire Ins. Co.,* 10 Wash. App. 841, 520 P.2d 622, 625 (1974) (citing

16   *Kavli v. Eagle Star Ins. Co.,* 206 Minn. 360, 288 N.W. 723 (1939)).

17        **B.    Application of Federal Arbitration Act**

18        Plaintiff's insurance policy contains no choice of law provision.  The Federal

19   Arbitration Act "create[s] a body of federal substantive law of arbitrability, applicable to

20   any agreement within the coverage of the Act." *Moses H. Cone Mem. Hosp. v. Mercury*

21   *Constr. Corp.* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941-42 (1983); *see also Cohen v. Webbush,*

22   *Noble, Cooke, Inc.,* 841 F.2d 282, 285 (9th Cir. 1988).  The Ninth Circuit has applied the

23   Act to a contractually required appraisal. *Raytheon Co. v. Rheem Mfg. Co.,* 322 F.2d 173

24   (9th Cir. 1963).[16]  District courts within the Ninth Circuit have found the FAA applicable to

25

26   [16] The Arizona Court of Appeals has applied Arizona's Arbitration Act, ARS §12-1501, *et. seq.,* in
     considering an appraisal clause in a fire policy. *Meineke v. Twin City Fire Ins. Co.,* 181 Ariz. 576, 892
     P.2d 1365, 1369 (1994).

- 4 -

1    appraisal clauses within insurance policies. *Wailua Associates v. Aetna Cas. & Sur. Co.,* 27

2    F Supp 2d 1211, 1214 (D. Haw. 1998); *Palozie v. State Farm Mutual Auto. Ins. Co.,* 1996

3    WL 814533, *2 (D. Ariz. 1996).

**C.    Public Policy in Favor of Appraisals**

5    The United States Supreme Court has recognized a national public policy supporting

6    arbitration and the rigorous enforcement of agreements to arbitrate. *Shearson/American*

7    *Express, Inc. v. McMahon, 42* US 220, 226, 107 S.Ct. 2332, 2337 (1987).  The Ninth

8    Circuit has also acknowledged "the strong federal policy encouraging arbitration. . ." *A. G.*

9    *Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1404 n.2 (9th Cir. 1992).[17]  The Ninth

10    Circuit has also noted that "the primary purpose of the FAA is to ensure enforcement of

11    private agreements to arbitrate . . ." *Lapine Technology Corp. v. Kyocera Corp.,* 130 F.3d

12    884, 888 (9th Cir. 1997).

**D.    Appraisal Awards are Final and Conclusive**

14    Consistent with the strong public policy favoring arbitration, appraisal awards are

15    final and conclusive absent fraud, mistake or other compelling circumstances. *9 U.S.C. §*

16    *10; G.C. and K.B. Investments, Inc. v. Wilson,* 326 F.3d 1096, 1105 (9th Cir. 2003). [18]  Under

17    the FAA, review of arbitration decisions is "both limited and highly deferential." *Coutee v.*

18    *Barington Capital Group, L.P.,* 336 F.3d 1128, 1132 (9th Cir. 2003) (*quoting Sheet Metal*

19    *Workers' Int'l Ass'n v. Madison Indus., Inc.,* 84 F3d 1186, 1190 (9th Cir. 1996)).  Courts are

20    to uphold arbitration awards where the arbitrator "even arguably constru[ed] or appl[ied]

21    the contract and act[ed] within the scope of his authority." *Pacific Reinsurance v. Ohio*

22    *Reinsurance,* 935 F.2d 1019, 1024 (9th Cir. 1991).  The rationale for this highly deferential

---

24    [17] The Arizona Court of Appeals has recognized that jurisdictions adopting the Uniform Arbitration Act
25    share a strong public policy favoring arbitration, *City of Cottonwood v. Fann Contracting,* 179 Ariz. 185,
877 P.2d 284, 292 (App. 1994), and that Arizona courts are required to view arbitration awards in a light
most favorable to their upholding. *Park Imperial, Inc. v. E.L. Farmer Construction Co.,* 9 Ariz. App. 511,
513-14, 454 P.2d 181, 183-84 (1969).

26    [18] Arizona law is in agreement, *Fisher v. National General Insurance Co.,* 192 Ariz. 366, 965 P.2d 100, 103
(App. 1998) and, in fact, has so held for 120 years.  *United States v. Ellis,* 2 Ariz. 253, 257 13 P 300, 302
(1887).

- 5 -

1  review has been explained as follows:

2  > The primary reason that parties resort to arbitration is to gain
   > the benefit of a quicker, easier dispute resolution process.
3  > These benefits would be radically diminished is courts readily
   > entertained public policy challenges to arbitral awards. *The*
4  > *finality of arbitral awards must be preserved if arbitration is*
   > *to remain a desirable alternative to courtroom litigation.*
5

6  *Arizona Electric Power Coop., Inc. v. Berkeley,* 59 F.3d 988, 992 (9th Cir. 1995) (*emphasis*

7  *added).*

8     A party resisting confirmation of the appraisal award has the burden of proof in

9  defending against its enforcement.  *Empresa Constr. Contex Limitada v. Iseki, Inc.,* 106

10 F.Supp 2d 1020, 1024 (S.D. Cal. 2000).[19]

11    **E.    Vast Majority of Courts Hold Appraisal Awards Are Final and**
          **Conclusive**
12

13    As stated above, appraisal provisions have been common in fire policies for over

14 one hundred years. Such provisions long ago withstood due process challenges.  *High*

15 *Country Arts and Craft Guild v. Hartford Fire Ins. Co.,* 126 F.3d 629, 633 (4th Cir. 1997)

16 (citing *Dealers Mut. Fire Ins. Co. v. Glidden Co.,* 284 U.S. 151, 159, 52 S.Ct. 69, 71, 76

17 L.Ed. 214 (1931)).  In *High Country,* the Fourth Circuit found that North Carolina law

18 clearly establishes that the insured and insurer are contractually bound by the results of an

19 appraisal award absent fraud, mistake or similarly compelling circumstances.  126 F.3d at

20 634.

21    Several other United States Courts of Appeal have recently made similar holdings

22 pursuant to the laws in which the disputes arose.  In *FDL, Inc. v. Cincinnati Ins, Co.,* 135

23 F.3d 503 (7th Cir. 1998), the court applied Indiana law and held as follows:

24    > Despite the fact that FDL attempts to short-circuit the
      > appraisal process by this lawsuit, under *Atlas,* a party who
25    > voluntarily submits to appraisal to determine the amount due
      > under a fire insurance policy is bound by the appraisal award,
26

---

[19] Once again, Arizona law is in agreement.  *Fisher,* 965 P.2d at 103.

1       absent exceptional circumstances. To hold otherwise would
frustrate the very purpose of appraisal clauses in cases such as
2       this.

3   *Id.* at 505 (citing *Atlas Construction Co., Inc. v. Indiana Ins. Co. Inc.,* 160 Ind. App. 33,

4   309 N.E.2d 810 (1974)); *see also Jupiter Aluminum Corp. v. Holm Ins. Co.,* 52 F.Supp 2d

5   885, 888 (N.D. Ill. 1999).

6       In *Jacobson v. Fireman's Fund Ins. Co.,* 111 F.3d 261 (2nd Cir. 1997), the Second

7   Circuit was required to determine similar issues under New York law.  In *Jacobson,* the

8   carrier invoked the appraisal provision and the insured had to be compelled by court order

9   to participate in the process.  After entry of the appraisal award, the insured sought to

10   pursue various state law claims for fraud and breach of contract. The Second Circuit

11   determined that the law of New York was ambiguous concerning whether the insureds

12   could pursue such claims in the wake of an unconfirmed appraisal award In predicting how

13   New York courts would rule, however, the Second Circuit held that the New York Court of

14   Appeals would decide that the appraisal award collaterally estopped the insureds' claims.

15   111 F.3d at 267-68.

16       The majority of state courts that have ruled upon the issue have also found that

17   appraisal awards are binding and conclusive upon the parties to the insurance contract.[20]

18   *Barnes v. Western Alliance Ins. Co.,* 844 S.W. 2d 264, 267 (Tex. App. 1994) ("Appraisal

19   awards made pursuant to the provisions of an insurance contract are binding and

20   enforceable. . . .Every reasonable presumption will be indulged to sustain an appraisal

21   award."); *Equity Mutual Ins. Co. v. Campbell,* 886 S.W.2d 221 (Mo. 1994); *Emmons v.*

22   *Lake States Ins. Co.,* 193 Mich.App. 460, 484 N.W.2d 712, 715 (1992) ("Judicial review is

23

24   [20] Arizona case law is replete with decisions confirming arbitration awards. *See, e.g., Funk v. Funk,* 6
    Ariz.App. 527, 434 P.2s 529 (1968); *Park Imperial, Inc, v. E.L. Farmer Construction Co.,* 9 Ariz.App.
25     511, 454 P.2d 181 (1969); *Verdix Steel & Construction Co. v. Board of Supervisors,* 19 Ariz. 547, 509
    P.2d 240 (1973); *Transnational Insurance Co. v. Simmons,* 19 Ariz.App. 354, 507 P.2d 693 (1973);
26     *Smitty's Super-Value, Inc. v. Pasqualetti,* 22 Ariz.App. 178, 525 P.2d 309 (1974); *Fisher v. National
    General Insurance Co.,* 192 Ariz. 366, 965 P.2d 100 (App. 1998); *Einhorn v. Valley Medical Spec.,* 172
    Ariz. 571, 838 P.2d 1332 (App. 1992).

1    limited to instances of bad faith, fraud, misconduct or manifest mistake"); *Central Life Ins.*

2    *Co. v. Aetna Cas. & Surety Co.*, 466 N.W.2d 257, 260 (Iowa 1991) ("Provisions for

3    appraisal of an insurance loss, . . .are valid and binding on the parties"); *Brethren Mutual*

4    *Ins. Co. v. Filsinger,* 54 Md. App. 357, 458 A.2d 880, 884 (1983) ("We think the award of

5    the appraisers, in the instant case, is final, binding, and not capable of revision by Brethren

6    or by the courts at its urgings.") *Appalachian Ins. Co. v. Rivcom Corp.,* 130 Cal.App. 3d

7    818, 182 Cal. Reporter 11, 14 (1982) ("California courts have enforced appraisal clauses in

8    fire insurance policies for almost 100 years.")

9    Several commentators are also in accord. 6 J. Appleman & J. Appleman, *Insurance*

10    *Law and Practice* §§ 3921, 3924 (1972); 15 *Couch on Insurance* § 213:1-3 (3rd Ed. 2000);

11    2 S. Cozen, *Insuring Real Property* § 30.05 (1992). Mr. Cozen addressed the topic as

12    follows:

13        It is very difficult to successfully impeach an appraisal award
    made by truly competent and disinterested appraisers, and

14        every reasonable presumption will be used to sustain such an
    award.

15

16                      ***

17        The courts prefer not to second-guess the appraisers and seem
    inclined to treat appraisal awards like jury verdicts where only
    questions of fact are involved. Since the appraisal award

18        involves only questions of fact as to the value or amount of
    loss, it is sometimes said to be "unreviewable on appeal."

19

20    *Id.* at P. 30-35 & 36.

21    **F.    No Grounds for Opposition Under 9 U.S.C. § 10**

22    Plaintiff will fail in any attempt to challenge the appraisal award under 9 U.S.C.

23    §10. In fact, given the factual background set forth above, it is unlikely that Plaintiff will

24    present any such argument. It cannot be disputed that the appraisal panel herein did not

25    exceed its power, was not partial and carried out its duties in a reasonable fashion. As the

26    Ninth Circuit stated in *G.C. & K.B.:*

- 8 -

Section 9 of the FAA provides that a federal district court "must grant [a confirmation] order unless the award is vacated, modified or corrected as prescribed in sections 10 and 11 of this title." There are only four grounds to vacate or to correct an arbitration award under sections 10 and 11: (1) fraud in the procurement of the agreement; (2) arbitrator corruption; (3) arbitrator misconduct or exceeding of powers; and (4) corrections for material miscalculations, exceeding the powers or imperfection of form.

\* \* \*

None of the limited grounds for vacating an arbitration award were put forth by the Wilsons either to the district court or to this court on appeal.

326 F.3d 1096, 1104 & 1006.  The same applies to this case.  Since none of the statutory grounds exist to disturb the appraisal award, the award must be confirmed.

III.        **CONCLUSION**

Appraisal awards are strongly favored for compelling public policy reasons.  Such awards are subject to severely constrained judicial review.  There exist no grounds upon which to deny confirmation of the appraisal award. The award should be confirmed, plaintiff should be prevented from disputing building repair cost damages and all claims relative to the amount of the structural loss should be dismissed.

RESPECTFULLY SUBMITTED this 29th day of January, 2007.

BROENING OBERG WOODS & WILSON, P.C.


By_____/s/ Wm. Rinaudo Phillips_____
            James R. Broening
            Wm. Rinaudo Phillips
            P. O. Box 20527
            Phoenix, Arizona  85036
            Attorneys for Defendant State Farm Fire and
            Casualty Company

/ / /

/ / /

- 9 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2007, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Pamela Crowder-Archibald
13231 N. 35th Avenue, Suite A-12
Phoenix, Arizona 85029

A courtesy copy with a copy of the Notice of Electronic filing was also **hand-delivered** to HONORABLE David G. Campbell  on this same date at the following address:

HONORABLE David G. Campbell
United States District Court
Sandra Day O'Connor U.S. Courthouse
401 West Washington Street, SPC
Phoenix, AZ 85003

- 10 -